## GEORGE T. CROWTHER *v.* THOMAS ROWLANDSON, AND ELIZA J. D. ROWLANDSON.

PROOF OF INSANITY.—Proof that at the time a grantor delivered a conveyance of property to the grantee, he was incapacitated from taking a rational care of his property by reason of mental delusion, is sufficient to justify a Court in setting aside the conveyance on the ground of the insanity of the grantor.   A total loss of understanding is evidence of an imbecile rather than of an insane mind.

LIMITATION OF ACTION TO SET ASIDE DEED OF INSANE MAN.— If a person, while insane, is fraudulently induced to execute a conveyance of his property to another, the Statute of Limitations will not commence running against the grantor's right to commence an action to set aside the deed, until he recovers his reason and discovers what he has done.

MOTION FOR NEW TRIAL AFTER REFERENCE.—If, after the Court has filed its findings of fact, and made an order sending the case to a referee to take and state an account, a motion is made for a new trial, the motion will not stay the proceedings pending before the referee.

WHEN NOTICE TO MOVE FOR NEW TRIAL SHOULD BE GIVEN.— If the case is tried by the Court, and findings of fact are made and filed, and the case is then sent to a referee to take and state an account, the necessary steps to apply for a new trial should not be taken until the final report of the referee is filed.

STATEMENT MUST SPECIFY ERROR.—On appeal from an order denying a new trial,

the appellate Court will not entertain an objection, however well founded, unless it is specified as an error in the statement.

TAKING AN ACCOUNT BY A REFEREE.—If a conveyance is set aside at the suit of the grantor, because of his insanity at the time of its delivery, the account taken under the decree should include such property only as passed into the hands of the grantee under the transfer.

ESTOPPEL IN RELATION TO DEPOSITION.—If a commission to take the deposition of a witness out of this State is issued, on the application of one party without the consent of the other, to a person who is not a Judge, or Justice of the Peace, or a Commissioner appointed by the Governor of this State, and the party who does not consent, after the appointment, files cross interrogatories, and stipulates as to the manner in which the deposition shall be returned, he is estopped from saying that the Commissioner was improperly appointed.

APPEAL from the District Court, Fourth Judicial District, City and County of San Francisco.

The complaint in this case sets forth substantially that the plaintiff, after a residence of some years in the City of San Francisco, was, on the 15th of April, 1856, possessed of real and personal property to the amount of about forty thousand dollars. That the defendant, Eliza J. D. Rowlandson, is the sister of the plaintiff, and the defendant, Thomas Rowlandson, her husband. That the defendants emigrated from England to California, and arrived in San Francisco about the first of March, 1856; that they were poor when they left England, and when they arrived in San Francisco were destitute of means; that when they arrived the plaintiff was in ill health, which affected his mind, and that he, soon after their arrival, became insane; that while in this condition the defendants instigated him to embark in the steamship for New York, on the 21st of April, 1856; that he reached the East in that situation, and did not recover so as to be fit for business for a period of two and a half to three years from that time; that he returned to San Francisco in November, 1860; that at the time he left, his property consisted: First—Of the stock in a store carried on by him in San Francisco, with a lease of the same, amounting in all to about ten thousand dollars in value, and bills receivable amounting to about fifteen thousand dollars. Second—A piece of land at San Francisco, near Mission

Dolores. Third—A house and improvements on Sutter street. Fourth—Some articles of household furniture.

The plaintiff avers that a bill of sale of the stock, or first item mentioned, was executed by him, while he was insane, to Thomas Rowlandson a few days before he left, or on the day he left; that on the same day he executed a deed of the land near Mission Dolores, the second piece of property above mentioned, to the other defendant, Eliza J. D. Rowlandson, and also the bill of sale of the house and improvements on Sutter street, and of the articles of household furniture, being the third and fourth pieces of property above mentioned.

He further states that no consideration was paid for those instruments; that he was insane when they were executed; that the defendant knew him to be then insane, and fraudulently procured him to execute those instruments, and when he left took possession of the property.

The consideration expressed on the face of those instruments is as follows, viz:

In the bill of sale to the defendant, Thomas Rowlandson, of the stock in trade, five thousand dollars. In the bill of sale to Mrs. Rowlandson of house and improvements on Sutter street, and the furniture, one thousand dollars, and in the deed of the real estate near Mission Dolores, to Mrs. Rowlandson, one dollar.

The complaint prays that those instruments be declared null and void; that the defendants be adjudged to reconvey the property thereby granted or transferred, and that they account for all moneys received by them for the rents, and from the personal property.

The answer of the defendants denies their pecuniary inability in England, or their want of means on their arrival in San Francisco. They deny the alleged insanity of the plaintiff at the time of the execution of the several instruments; they aver that the bill of sale of the house and improvements was executed on the 15th August, 1855, instead of the 15th April, 1856, and was delivered to defendant, Mrs. Rowlandson, immediately on her arrival. The consideration for the sale

of the stock is particularly set out, and they deny that the several instruments were executed without any consideration; they deny that the plaintiff became insane before he left San Francisco, and that instead of inducing him to leave, he went away against their urgent request and remonstrance. It is also alleged that the plaintiff recovered the entire use of his reason in 1857, and they plead the Statute of Limitations, the action not having been commenced till the 2d October, 1861, more than three years from the time of his recovery.

A replication was filed in which plaintiff admits that he made a mistake in the complaint as to the date of the bill of sale of the house and furniture to Mrs. Rowlandson, but he denies on his information and belief that it was delivered to her immediately on her arrival at San Francisco.

The other facts are stated in the opinion of the Court.

*P. G. Buchan,* for Appellants.

The law on the question of insanity or mental imbecility affecting civil contracts, is well settled.

No degree of physical or mental imbecility which does not deprive one of legal competency to act is of itself sufficient to avoid a contract. (*Farnham* v. *Brooks,* 9 Pick. 212.)

A contract with a man of weak mind is binding, if no fraud or undue advantage is taken of his situation. (*Somes* v. *Skinner,* 16 Mass. 358.)

In order to avoid a deed, an entire loss of the understanding must be shown. Proof of a weak or impaired mind, or a want of understanding on some occasion only, is not enough. (*Person* v. *Warren,* 14 Barb. N. Y. 458; *Jackson* v. *King,* 21 Cowen, 207; *Petrie* v. *Shoemaker,* 24 Wend. 45.)

Mere imbecility is not sufficient. (*Blanchard* v. *Nestle,* 3 Denio, 37; see also the celebrated Parrish case in the 25th New York Reports, recently published, where the whole doctrine is fully discussed.)

*Hoge & Wilson,* for Respondent, referred to Stock on *Non*

*Compos Mentis*, 25 Law Lib. 1–12 ; and Shelford on Lunacy, 1–49 ; and Halsam on Madness, 41, 42.)

By the Court, SHAFTER, J.

The plaintiff executed to his sister, Mrs. Rowlandson, a deed of a lot situate near the Mission Dolores, in the City and County of San Francisco, and a bill of sale of a house, and other improvements, on a lot on Sutter street, including also certain household furniture. The conveyance bears date April 15, 1856, and the bill of sale, August 15, 1855, but both were acknowledged on the same day, viz: April 15, 1856. The plaintiff also sold to Thomas Rowlandson, at or about the same date, a warehouse situate on Leidesdorff street, together with the plaintiff's stock in trade therein, and assigned to Rowlandson the lease of the lot on which the warehouse stood, and the good will of the plaintiff's business as a wholesale and retail liquor merchant, and certain book debts and bills receivable— all of the aggregate value of twenty-five thousand dollars. The plaintiff left for the East by the steamer of April 21, 1856, and Rowlandson on that day took possession of all and singular the property before named, and proceeded in the conduct of the liquor business, and in the management of all the property, in his own name. The plaintiff returned to this State November 24, 1860, and on the 2d of October, 1861, commenced this action for the purpose of setting aside the conveyance, bills of sale and assignments aforesaid, on the ground that he was incapacitated by insanity from transacting business at the time the papers were executed. The answer denies the allegation of insanity, and sets up the Statute of Limitations in bar. The trial was by the Court, who found for the plaintiff on both issues. The defendants moved for a new trial, on the ground that the evidence did not justify the decision, and also on the ground of certain alleged errors of law occurring at the trial. A new trial was denied, and the defendants' appeal is from the order.

First—As to the sufficiency of the evidence to justify the

finding that the plaintiff was insane at the time the conveyance and the other instruments were executed.

The appellants insist that there is no evidence in the case tending to prove that the plaintiff was insane at the time the execution of the papers was perfected by delivery; or if there was, still that the evidence on the other side was so overwhelming, as to justify the interposition of this Court under the rules by which its practice in such cases is governed.

The only point which we are here called upon to consider, is, whether there was a sensible conflict in the evidence bearing upon the question of insanity.

The counsel of the appellants is mistaken in supposing that the plaintiff's alleged insanity could be established only by proof that he was "entirely destitute of understanding." Loss of understanding would be proof of an imbecile rather than of an insane or disordered mind. Fatuity is one thing, and madness is another; and an answer to the larger part of the argument submitted for the appellants, is found in the fact, that the distinction between the two has been overlooked. To establish the insanity alleged, it was sufficient for the plaintiff to prove that at the time he delivered the instruments referred to, he was incapacitated from a rational care of his property by reason of mental delusion. (*Bond* v. *Bond,* 7 Allen, 1.)

It appears that sometime before the instruments in question were executed, the plaintiff became involved in lawsuits, which were pending on the 21st of April, 1856, the day on which he left for the East; and the purpose and drift of the plaintiff's evidence, was, to show that the merely natural concern awakened in his mind by the litigation, in the first instance, had, in the progress of events, taken on the form and impress of an insane fear that he was in danger of losing, or of being "robbed" of his property through the lawsuits so pending against him; and that under the influence of that delusion he transferred all of his property without consideration to his sister and her husband.

It may be true that Crowther, when he first conceived the purpose of transferring his property, was perfectly sane, and

that he was also sane when he opened a sham account with Mrs. Rowlandson before her arrival here from England; still, if, as matter of fact, he finally executed the papers in question under the influence and ascendency of the delusion named, it is enough. Though one of the instruments bears date August 15, 1855, and the others April 15, 1856, yet there was evidence introduced tending to prove that they were not in fact delivered until the 21st of that month—the day when they were all acknowledged. On that day, the plaintiff embarked for New York on board the steamer Sonora. A fellow passenger, who had known Crowther for some years, testified, that on the evening of the 21st, his conversation was rambling and incoherent, and was still more so the next day; that he talked about his troubles—asked the witness if "he thought they would rob him," and said he "did not know but that they would ruin him." He said he came away all of a sudden—talked about his lawsuits, was confused, and the witness thought he was drunk "because he talked so foolish." There was no evidence that plaintiff drank anything on board, and none even that he ever indulged in the use of liquor. It further appeared, that on the third or fourth day out, the plaintiff "became a perfect maniac," stripped himself of his clothing and attempted to jump overboard. After this he was kept in a close room until the arrival of the steamer at Panama. At Panama, Crowther was put in the custody of a man hired for the purpose by the Captain of the steamer, and was accompanied by him to New York and thence to his friends in the State of Maine. On his arrival there, he was placed by his friends in the Insane Asylum at Augusta.

We need not remark upon the tendency of this testimony, nor upon the question of its force. The particular facts which it discloses are recognized indications of insanity—the apparent inebriation being one of the most significant. (Shelford on Lunacy, pp. 49, 67.) And it is to be borne in mind that these indications were developed, and in a remarkable degree, on the very day when the instruments in question were executed, and but two or three days before the plaintiff became

lunatic beyond question. Were there no other testimony than that which we have referred to, the motion for new trial would have to be denied. But there is other testimony tending to prove that Crowther was under the influence of the particular delusion referred to, at the time when the papers were delivered, and at least for some days before. It was in proof that Crowther was of a highly nervous temperament; that he had been in the charge of his physician for some twelve months before he left for the East; that " his disease was more mental than bodily ;" that this mental disease increased gradually ; that the disease threatened to terminate in lunacy, and might have been brought on by excitement at any moment ; that a judgment for five thousand dollars in a slander suit had been recovered against him, and that he had been confined to his room for some ten days before he left for the East; that he was irritable, wakeful, and given to nightwalking ; that " prior to his leaving he was in the most excited state of nervous irritability," and so much so that the defendant Rowlandson " dreaded the effect of the voyage, and opposed it, only ceasing to do so when he found that his staying might probably be productive of more injury than taking the voyage." Rowlandson, in a letter addressed to the Superintendent of the Maine Asylum, says : " He (Crowther) was rapidly recovering before he left San Francisco, a relapse being occasioned by the excitement of a forthcoming trial." Crowther's physician testified that he " called on Crowther the day the boat was about to leave. Was sent for by Rowlandson, but came away without seeing him (Crowther). Was told by Rowlandson that Crowther was up stairs, very excitable, and it perhaps would be better not to see him. Heard him walking to and fro overhead." The testimony on the part of the plaintiff · further tended to prove that Crowther was worth some forty thousand dollars, and was in good standing and credit as a merchant, and there was little or no proof that his apprehensions of ruin, as the result of his lawsuits, had any rational basis. The evidence of the plaintiff runs largely into detail, but the substance of it is contained in the foregoing summary. This

testimony of the plaintiff, had, in our judgment, a manifest tendency to prove the insanity alleged. The evidence introduced by the defendants in support of their denial of the allegation of insanity, was very far from being destitute of weight, and if the Court had found the point against the plaintiff instead of for him, we could not have disturbed the judgment on the ground of a false finding.

Second—As to the defense of the Statute of Limitations.

The complaint not only alleges insanity on the part of the plaintiff, but contains allegations of fraud on the part of the defendants, and the replication meets the bar of the statute on the ground that the action was brought before the expiration of three years from the time when the fraud was discovered. We have examined the testimony bearing upon the question raised by the replication, and have considered the arguments of counsel. The evidence tends to prove that the plaintiff recovered his reason in February, 1857, and it is admitted that he returned to the State, November 24, 1860. Assuming that the plaintiff was insane at the time when the conveyance and bills of sale were executed, there can be no doubt that the point in controversy might well have been found in the plaintiff's favor on the ground of that fact alone. All, or some at least, of the instruments were recorded, but it cannot be inferred from that that the plaintiff was advised, before his return to the country, of what he had done while insane. Nor does it appear that either of the defendants, in the frequent letters written by them to Crowther, or his friends during his absence, made any disclosures on that subject. A power of attorney, executed by the plaintiff to Rowlandson at or about the 21st of April, 1856, is referred to in the correspondence, and the prominent idea, presented in all the letters, is, that Rowlandson was managing the property and business, as the agent of the plaintiff, to whom it still belonged, and to whom he held himself accountable. There was also evidence tending to prove that the defendants had availed themselves of the plaintiff's insanity to procure the execution of the instruments in question. The weight of this evidence was with the Court

that tried the cause, and, under the settled practice of this Court, we cannot review its finding.

Third—The findings were filed March 19, 1863, and the case was referred to a Master to take and state an account. On the 30th of the same month, the defendants filed and served a notice of motion for a new trial. On the 27th of April following, the defendants moved for a stay of proceedings then pending before the referee, on the ground of the pendency of the motion for new trial. The motion was denied, and the denial is assigned for error.

By the one hundred and ninety-fifth section of the Act of 1863, it is provided that when "an action has been tried by the Court, or by a Commissioner or a referee," the party intending to move for a new trial shall give a written notice thereof within ten days after receiving written notice of the findings of the Judge, or the report of the Commissioner or referee. The issues in this case were tried in part by the Court and were in part committed for trial to a referee; and therefore, the case does not fall within either of the express allotments of the section. But it is apparent that the intention of the Legislature, was, that proceedings in new trials should be postponed until cases had been "tried." The trial of this case was not complete until the final report of the referee was filed. As the defendants renewed their notice of motion for new trial after the report was filed, and on a new statement, a decision of the point upon which we have just passed, is of no practical consequence, except, as it bears upon the regularity and effect of the referee's report as a proceeding in the case.

Fourth—It is objected that, on the evidence in the case, the plaintiff was entitled to an allowance of five hundred dollars only as advance to the defendants by Brown Brothers & Co., in New York. This objection cannot be entertained, however well founded it may be, for the reason that it is not specified as an error of fact in the statement on motion for new trial.

Fifth—As to the seven hundred dollars advanced by the plaintiff to the defendant Rowlandson before he left England

49

for this country, it was improperly allowed. The only account that could be taken, in the theory of the action, was of the property which passed into the hands of the defendants under the transfer, or by virtue of the power of attorney, made by the plaintiff while insane.

Sixth—It is urged that the Court erred in overruling the objection taken to the deposition of J. W. Crowther.

We are satisfied that the transactions connected with the taking of the deposition preclude the defendants from saying that the Commissioner was not a person competent to take it. Cross interrogatories were filed after the order designating the Commissioner was made, and were, together with the interrogatories in chief, annexed to the commission. Subsequently the defendants stipulated that the commission "authorizing the Hon. George Evans to take the deposition of John W. Crowther, at the City of Portland, in the State of Maine, to be read in evidence on the trial of said action," should be returned by Wells & Fargo's Express. The defendants also obtained a stipulation from plaintiff's attorneys granting further time within which to file cross interrogatories, and themselves stipulated that the deposition might be opened by the plaintiff without prejudice to his right to read it in evidence at the trial of the action. The filing of the cross interrogatories after the Commissioner had been appointed, coupled with the first stipulation, in our judgment estopped the defendants from saying that the Commissioner was improperly appointed.

In the event that the plaintiff shall, within fifteen days, file with the Clerk of this Court a release of the personal judgment against the defendants of sixteen thousand seven hundred and ninety-nine dollars and forty-two cents, to the extent of seven hundred dollars parcel thereof, the judgment will stand as affirmed, otherwise the judgment is reversed and new trial granted.

And it is so ordered.

Mr. Justice SAWYER being disqualified did not participate in the decision of this case.

By the Court, SHAFTER, J., on petition for rehearing.

Motion for rehearing.

In the opinion filed in this action at the last term, we held there was evidence in the case tending to prove that the bill of sale of the house and improvements on Sutter street, though dated August 15, 1855, was not in fact delivered until the 21st of April, 1856. We so held under the impression that it appeared by the record that the instrument was in the hands of Crowther on the day named, and that he then personally appeared before a notary and acknowledged its execution. We were mistaken, in that particular, however. The bill of sale, instead of being acknowledged by Crowther, was proved before the notary by the attesting witness. A rehearing is granted, in so far as the question of the validity of said bill of sale is concerned, unless the plaintiff within fifteen days shall file with the Clerk of this Court a release fully discharging the property embraced in said bill of sale from the operation of the decree; whereupon the decree will be and stand as reversed in so far as it avoids and annuls said bill of sale, and will be and stand as affirmed as to the residue thereof, except in the particular wherein it has already been modified—the appellants to recover the costs of appeal.

And it is so ordered.

SANDERSON, C. J., dissenting.

In order to entitle a party to the relief sought in this case, upon the ground alleged, it must be made to appear, by satisfactory evidence, that he was, at the time of the execution and delivery of the several instruments sought to be cancelled, *non compos mentis*, within the legal meaning of those words. It is not sufficient to show a partial want of reason or understanding, for an entire and total absence must be shown in

order to authorize the avoidance of a deed where there is no *fraud* apparent on the part of the grantee. In *Osterhout* v. *Shoemaker*, (reported in Note *a* to *Blanchard* v. *Nestle*, 3 Denio, 37,) Mr. Chief Justice Bronson said : " Our law does not distinguish between different degrees of intelligence. It does not deny to a man of a very feeble mind the right to make contracts and manage his own affairs. In the absence of fraud, proof of mere imbecility of mind in the grantor, however great it may be, will not avoid his deed. There must be a total want of understanding."

The legal presumption is that every man is *compos mentis*, and the burden of proof that he is *non compos mentis* rests on the party who alleges it. Unless, therefore, it appears from the testimony in the case that the plaintiff was a lunatic, or entirely deprived of his reason and understanding at the time the several instruments mentioned in the complaint were executed and delivered by him to the defendants, he has failed to sustain his action, for the charge of fraud is, in my judgment, without foundation in the evidence. It is agreed that all the evidence bearing upon the question is contained in the transcript.

The plaintiff alleges that his insanity commenced soon after the first of March, 1856, which was the date of the defendants' arrival in San Francisco. The bill of sale of the house and improvements on Sutter street to the defendant Mrs. Rowlandson was made on the 15th of August, 1855, more than six months prior to the alleged date of the plaintiff's insanity. The only testimony as to the delivery of this bill of sale is that of the defendant Thomas Rowlandson, who stated that the plaintiff delivered it to his wife at breakfast on the morning after their arrival in San Francisco, which was the second of March, 1856, and according to the plaintiff's own statement, prior to the date of his insanity. The other instruments were executed on the 15th of April, 1856, and acknowledged on the 21st of the same month, the latter being the same day on which the plaintiff sailed for New York.

The only witness examined by the plaintiff for the purpose

of establishing his insanity at or prior to the 15th of April, was Dr. Mackintosh, who had known the plaintiff for about twelve years, and for several years prior to his departure for the Atlantic States in 1856 had been his attending physician. Dr. Mackintosh stated that he last saw the plaintiff in 1856, about fifteen days before his departure; that plaintiff had been confined to his bed about ten days some short time prior to his departure East; that his disease was more mental than bodily; that his symptoms were alarming, showing a tendency to insanity. Upon cross examination Dr. Mackintosh stated that he could not say that the plaintiff was *non compos mentis* during any portion of the time he saw or attended him; but on re-examination he testified that his condition was such that he might have become insane at any moment from any exciting cause; that any prostration in his business or change in his property might have brought on mental alienation. Dr. Mackintosh was examined not only as the plaintiff's attending physician, but as a medical expert. The most that can be claimed for his testimony is that it establishes a condition of health on the part of the plaintiff, at or about the time of his departure for the East, threatening future insanity upon any exciting cause affecting his business; but his testimony utterly fails to show that at any time prior to his departure the plaintiff had passed from sanity to insanity. If there is any other testimony than that of Dr. Mackintosh tending to establish insanity prior to the plaintiff's departure for the East, it has escaped my notice.

On the part of the defense, several witnesses were examined for the purpose of showing that up to that time the plaintiff was perfectly sane. Among them was Mr. Richards, the confidential clerk, bookkeeper and business man of the plaintiff, who drew the instruments in question, and Thibault, the notary who took the acknowledgments. Also, Clement Nixon, who was the plaintiff's barkeeper, and William McDonald, who was his drayman, and several others, who, as is shown, were on terms of intimacy with the plaintiff up to or within a short time of his departure, all of whom testified that they never

saw anything in the plaintiff's manner or conduct indicative of insanity. It is true that the testimony of these witnesses is of a negative character, but in view of their long acquaintance with the plaintiff, and their means of observation and knowledge, it is entitled to great weight, especially when sustained by the evidence of a medical attendant who negatives the idea of present insanity. In this connection, it is well to call attention to the following note, written by the plaintiff four days after leaving San Francisco, and addressed to the steward of the steamship Sonora, on board of which the plaintiff sailed:

" Mr. THOMAS HARRIS—Dear Sir : Should anything happen to me on this passage, you will please take charge of all my things and deliver them to my brother-in-law, Mr. Thomas Rowlandson, of San Francisco, on your return. He will pay you any charge you have on them. I send my best love to my dear sister and all the folks.

" I am, dear sir, yours truly,

" GEORGE T. CROWTHER.

" Friday morning, steamer Sonora, on her passage to Panama."

The plaintiff was certainly sane when he wrote this note, but seems to have had at that time a presentiment of the calamity which soon after befell him.

For the purpose of showing that the plaintiff was insane when he sailed from San Francisco, or became so soon after, Joseph H. Lyon, a fellow passenger, was examined on the part of the plaintiff, who testified to what are shown to have been symptoms of insanity, commencing with the day of his departure and continuing until the third or fourth day, at which time he became, in the language of the witness, " a perfect maniac." On the part of the defendants the purser of the ship, Mr. Goddard, was examined, who testified that he had been previously acquainted with the plaintiff. That he saw him on the second day out and two or three times a day thereafter until he became insane, and did not observe for the first

five days of the voyage anything in the manner and appearance of the plaintiff different from what he had observed in his previous acquaintance with him. It was his impression that the ship was approaching the tropics, about five days after starting, before anything was discovered or appeared to be the matter with the plaintiff. According to the testimony of both these witnesses there was a cabin passenger by the name of Lazard on board who, according to Lyon, occupied a room adjoining that of the plaintiff, and according to Goddard a room in the same part of the ship. Lazard had a keeper and was very violent and noisy. As to the effect of going into a warm climate and a close proximity with a raving maniac upon a person having a tendency to insanity, Dr. Mackintosh was examined as an expert, and testified that these circumstances would have a tendency to produce an exaltation of the disease, and also to confirm it. Such is, in substance, all the testimony bearing upon the question of insanity except the fact that the instruments were executed without consideration.

The Court below found that the plaintiff conveyed the property in question to the defendants without any consideration, and I think that the finding in this respect is sustained by the evidence. The fact that a man has conveyed away, without consideration, all or nearly all of his property, unexplained, might afford ground to suspect his sanity, and if the other testimony in this case failed to explain the plaintiff's conduct in this respect, I should be strongly inclined to hold that the finding of the Court below was correct. It is very difficult, if not impossible, to show by testimony the precise point of time at which sanity ends and insanity begins; and where it is clearly shown, as in the present case, that insanity actually existed within a short time after the events alleged to have been produced by it occurred, we should be justified in holding that the actor was at the time insane, when his acts are contrary to human experience and can be explained upon no rational theory. But I think that the conveyance of nearly all of his property by the plaintiff to his sister and her husband can be explained upon a rational theory deducible from the

evidence in the case, and that it can be shown that such theory is consistent with a sane, though not with an honest purpose, and that such conveyance, instead of being one of the effects of insanity, was a link in the chain of circumstances by which it was induced.

It appears from the evidence that at the time these convey-ances were made there were several suits at law pending against the plaintiff for large amounts of money, one of which had already ripened into judgment for the sum of five thou-sand dollars and was standing on appeal. These suits were a source of constant annoyance and apprehension to the plaintiff and the staple of his thoughts and conversation. Suffering more or less from illness and the depression of spirits thereby induced it is not surprising that he should have regarded them, as he seems to have done, as threatening financial ruin. Nor is it altogether contrary to human experience to find him, under such circumstances, preparing to avoid the conse-quences of the coming storm in a manner in which neither law nor good morals can justify. It further appears, as we have already seen, that he commenced the work of transfer-ring his property as early as August, 1855, by executing to his sister a bill of sale of the house and improvements on Sutter street, at a time when there is no pretense that he was insane, and without any consideration, as he himself alleges. And in January, 1856, he caused his bookkeeper to open an account with his sister, who had not yet arrived in the coun-try, and from whom, according to his own account, he had never received a dollar, commencing with a credit of one thousand five hundred and thirty-seven dollars, cash loaned. He also bought a buggy for the sum of three hundred and fifty dollars in his sister's name ; also, some property at the sale of the Folsom estate ; all of which was done at a time long prior to the date at which he alleges he became insane. When his sister arrived, he delivered the bill of sale, and afterwards proceeded and fully executed the design which he seems to have formed six months previous, by conveying his real estate to his sister, and transferring his mercantile busi-

ness, including stock in trade, to her husband, and soon after departed from the State. Bodily illness, care and anxiety on account of his business affairs, apprehension of ruinous results following from the pending lawsuits, in connection with the fear that he had placed himself too much in the power of his sister and her husband, soon thereafter resulted in temporary insanity.

This theory, that the plaintiff transferred his property to his sister and brother-in-law for the purpose of placing it beyond the reach of his creditors, is moreover fully sustained by letters written by Rowlandson to the brother of the plaintiff, residing in Maine, and introduced in evidence by the plaintiff. In those letters Rowlandson represents himself as carrying on the business for the plaintiff, and desires that the plaintiff may be assured that his affairs are not suffering in consequence of his absence. This language, used at a time when the pending controversies could not have been anticipated, is in perfect harmony with the view which I have taken of this transaction, but it is widely at variance with the theory upon which this action is sought to be maintained. Had Rowlandson fraudulently taken advantage of the plaintiff's alleged insanity for the purpose of robbing him of his estate, under the pretense of a purchase, he would not afterwards have spoken in letters to the brother of the plaintiff of the business and estate as being conducted and managed by him as the agent of the plaintiff and for his use and benefit.

Thus, the fact that the conveyances were made without consideration is explained by the testimony in the case, and shown to be consistent with the idea of sanity. Leaving this fact, therefore, out of view, the question of insanity is made to depend for its solution solely upon the testimony of Dr. Mackintosh and Lyon, on the part of the plaintiff, and Goddard, Richards, Thibault, Nixon, McDonald and others, whose testimony was of a like character with that of the last four named, and the plaintiff's note to the ship's steward, on the part of the defendants. This testimony shows that the plaintiff became insane four or five days after he left San Francisco, but

Points decided.

in my judgment utterly fails to show that he was insane on the 15th of August, 1855, when he executed the bill of sale of the house on Sutter street, or on the 2d of March, 1856, when he delivered it to his sister, or on the 15th of April, 1856, when he executed the other papers, or on the 21st of the same month, when he acknowledged their execution. On the contrary, there is in this testimony no conflict, and it all tends to prove, if it proves anything, that the plaintiff at these several dates was sane, or at least that he was not *non compos mentis* within the legal meaning of those words.

Such being my views upon the controlling question involved in this case, I am compelled to dissent from the judgment pronounced by a majority of the Court.

I think the judgment should be reversed and a new trial ordered.