HENRY T. CLARKE V. LEMUEL B. IRWIN ET AL.

FILED JANUARY 8, 1902.   No. 9,849.

Commissioner's opinion, Department No. 1.

1. **Insanity**: NON-EXPERT WITNESS.  A non-expert witness may be permitted to state whether, in his opinion, a person is sane or insane, if he is shown to have had a more or less extended and intimate acquaintance with such person, and gives the facts and circumstances upon which the opinion is based; the weight to be given such testimony, being a question for the jury, to be considered by them in connection with the credibility and intelligence of the witness, and his opportunities for observation.

2. **Hearsay.**  The testimony of a witness as to a conversation had with, or declarations made by him to, others as to the sanity or insanity of a person is inadmissible on the question of insanity, on the ground that it is hearsay.

3. **Ejectment**: ADVERSE POSSESSION: INSANITY OF ANCESTOR.  In an action of ejectment, where the defendant pleads adverse possession, and the plaintiff in reply pleads the insanity of his ancestor to defeat the statute, plaintiff must show by a preponderance of the evidence that his ancestor was insane with reference to the subject-matter of the controversy, and that, owing to the insanity, his ancestor allowed others to assert title to his property, taking no precautions to protect the same, and that such insanity was continuous from the time defendant went into possession until a time less than ten years prior to the commencement of the action.

4. **Instructions.**  Instructions set out in the opinion examined, and *held* not to present for the determination of the jury the material issue in the case.

ERROR from the district court for Sarpy county.  Tried below before POWELL, J.  *Reversed.*

*Wright & Thomas, J. W. Carr* and *H. T. Clarke, Jr.,* for plaintiff in error.

*Hall & McCulloch* and *George W. Covell, contra.*

KIRKPATRICK, C.

This is an action brought in the district court for Sarpy county by defendants in error against plaintiff in error on the 18th day of June, 1894, to recover possession of certain

lands, together with rents and profits. The petition pleaded that defendants in error were the owners and entitled to the immediate possession of the lands, describing them; that plaintiff in error wrongfully withheld possession of the premises, and kept defendants in error out of possession; that they were entitled to rents and profits in an amount set out, and prayed judgment for possession and for damages. The answer of plaintiff in error, so far as material to this inquiry, is that he had been in the open, notorious and exclusive adverse possession of the premises described in the petition for a period of ten years and more, to wit, for about twenty-six years. To this answer a reply was filed, pleading that at all times set out in the answer, and long prior thereto, John Irwin, the ancestor of defendants in error, was insane and *non compos mentis,* and that on the 20th day of October, 1893, he died insane. Trial was had to a jury, which resulted in a verdict and judgment for defendants in error. Many assignments of error are made, but they will be considered under three general divisions, as follows: First, errors of the court in the admission and exclusion of evidence; second, errors of the court in the giving and refusing instructions; third, that the evidence is not sufficient to sustain the verdict. These assignments, so far as necessary to a determination of the case, will be considered in the order named.

It appears from the record that plaintiff in error called in a large number of non-expert witnesses, who had known Irwin for many years, some of them having been his neighbors, and who had resided within a few blocks of him for ten or fifteen years, and sought by the evidence of these witnesses to show that Irwin was not insane. This evidence was excluded by the trial court. It is not necessary to a proper determination of this case to examine the evidence of these witnesses in detail. One Wilson McFarron was among the witnesses called. He testified that he had known Irwin quite intimately for many years, had resided in the same town with him for more than three years, and had seen and talked with him very frequently, and during

his acquaintance had several business transactions with
him.   He had purchased some land warrants from Irwin,
and had borrowed one or more, either from Irwin or his
agent, for the purpose of locating land.   He had purchased
an eighty of 160 acres of land upon which Irwin held a
mortgage.   The land had timber upon it, and the witness,
after trying in vain to get Irwin to make some arrange-
ments by which the other eighty could be first sold, pro-
ceeded to cut the timber.   Irwin notified him to stop cut-
ting, but he persisted until the day before the land was
sold.   It seems to be a well-settled rule that non-expert
witnesses who show a personal acquaintance with the per-
son alleged to be insane, extending over a considerable
period of time, and are shown to have a sufficient acquaint-
ance to be able to form an opinion, after detailing to the
jury the facts and circumstances upon which such opinion
is based, are permitted to testify whether in their opinion
such person is sane or insane.   The established doctrine is
that if the witness has sufficient opportunity for observa-
tion to enable him to form an opinion upon the question of
the sanity of the person, then he is a competent witness,
and may be permitted to testify to such opinion.   This rule
seems based upon sound reason.   In fact, if the rule were
otherwise, grievous hardship and injustice might frequently
result.   Cases might, and frequently do, arise in which
medical experts differ as to whether the person in question
is sane or otherwise.   In such cases, in the absence of a rule
permitting non-expert witnesses to testify, the jury might
not be able correctly to determine whether the person was
or was not insane.   The qualification of the witness to give
his opinion of the sanity of a person is a question resting
very largely in the sound discretion of the trial court.
There is no doubt that, had the witness McFarron given in
detail all the facts and circumstances of his acquaintance
with Irwin, the different times he had seen him, how he
looked, talked and acted, and how he did business, his tes-
timony would have had more probative force, and would
have been of more value to the jury than as offered.   But

this objection goes rather to the weight than to the competency of the evidence. The weight to be given testimony is exclusively for the jury, taking into consideration the credibility and intelligence of the witness, and his opportunity for observation. *Hardy v. Merrill*, 56 N. H., 227, 241; *Schlencker v. State*, 9 Nebr., 241; *Polin v. State*, 14 Nebr., 540, 546; *Burgo v. State*, 26 Nebr., 643; *Connecticut Mutual Life Ins. Co. v. Lathrop*, 111 U. S., 612, 619; *State v. Lewis*, 20 Nev., 333. This evidence should have been received, and its exclusion was error.

Plaintiff in error offered in evidence a deed executed by John Irwin, as attorney in fact for Samuel Irwin, dated and acknowledged September 23, 1878. The purpose of this evidence seems to have been to show that John Irwin was sane at the date of its execution. George W. Covell, who signed the deed as a witness, and also took the acknowledgment of Irwin, was called and testified. After being identified as the Covell who took the acknowledgment, he was examined by defendants in error, and, over objections of plaintiff in error, was permitted to testify as follows:

Q. State the circumstances of that. [The execution of the deed.]

A. Mr. Irwin was brought to my office by Mr. Stevenson, to execute this deed.

Q. I am speaking now of the Metzler deed.

A. That is Lewis Metzler. * * *

Q. He was brought to you by Metzler?

A. Metzler and Stevenson. Metzler was the mortgagee in the deed, and Stevenson was the attorney who had charge of matters for Samuel Irwin, and the deed was executed and acknowledged before me at that time. I had been doing business for Mr. Metzler prior to this time, and sold him quite an amount of land; and Mr. Metzler asked me at the time——[Here witness was interrupted by an objection.] And Mr. Metzler asked me at that time whether or not a deed made by John Irwin as attorney in fact for Samuel Irwin would convey him anything, and I said, "Nothing except on the face of the record."

After an objection on the ground that the giving of this conversation was incompetent and immaterial, and a motion to strike it out overruled, the witness continued:

"I further stated to him that Samuel Irwin was insane, and John Irwin was insane, and that neither one of them had any capacity to make any conveyance."

Plaintiff in error renewed his motion to strike this testimony as incompetent, which was overruled, to which exceptions were taken. There can be little doubt that this testimony was inadmissible, for the reason that it is hearsay. It purports to be of a conversation had between the witnesses, when not under oath, and one of the parties to the deed. That such testimony was inadmissible, would seem to be elementary, and require citation of but little authority. In the case of *Harrison v. Rowan*, 3 Wash. C. C. [U. S.], 580, it is said: "A witness may depose as to what he thought of the testator's sanity, at or about the time the will was made; but not as to what the witness had declared upon the subject to others."

Plaintiff in error complains of various instructions given by the court upon its own motion. In order properly to understand the questions to be determined in this case, it will be necessary to consider instructions Nos. 6, 7, 8, 9 and 10, which comprise all the instructions given in the case, except instructions concerning the issues, certain admitted facts and the manner of arriving at and returning a sealed verdict, about which there is no complaint. The instructions given are as follows:

"6. You are instructed that the patents and deeds introduced in evidence in this case conclusively show that prior to and at the time of his death, John Irwin was the owner and entitled to the possession of the lands in controversy, and under the proofs herein the same must be held to have descended to his heirs, who are the plaintiffs in this action, and you must find for the plaintiffs unless you should find that the defendant has acquired title to said lands by adverse possession, as hereinafter explained.

"7. You are instructed that under the law and the evi-

dence adduced in this case, it further conclusively appears that the defendant Henry T. Clarke, prior to the commencement of this action, had acquired a valid title to the lands in controversy by adverse possession, and your verdict should therefore be for said defendant, unless it has been shown by a preponderance of the evidence that John Irwin, at the time said Clarke went into possession of said lands (which for the purposes of this instruction is agreed by both plaintiffs and defendant to be January 1st, 1880), was insane, and that such insanity was continuous for a period of not less than ten years thereafter.

"8. For the purposes of this case, insanity may be defined as a diseased condition of the mind, in which the person afflicted has not the right use of his reason, especially with reference to certain subjects and duties; in which condition his conduct with respect to such subjects or duties is induced by the disease, and in which by reason of such disease he is unable rightly to comprehend the nature of his acts, together with the effects and consequences of such acts or of a failure to act.

"9. You are instructed that for the purpose of deciding the question of whether or not John Irwin was insane under the issues and instructions in this case, you have a right to consider the conduct and demeanor of said John Irwin, his acts on the streets and at home, which appear from the evidence; his habits with respect to collecting pieces of paper, apparently useless, in large quantities, if you find from the evidence he had such habit; whether or not he allowed valuable property to be taken away from him without taking precautions to protect the same, and also any belief, without reason for such belief, that there was a conspiracy formed to rob him of his property, if you find from the evidence that such facts and beliefs existed, give to such facts and circumstances such weight as you believe them entitled to, when considered in connection with all the other facts and circumstances shown at the trial.

"10. You are instructed that if you find from a preponderance of the evidence that John Irwin was insane, as de-

fined in the foregoing instructions, at the time defendant Clarke took possession of the premises in controversy, and that he was continuously insane for ten years thereafter, your verdict must be for plaintiffs."

The objections to these instructions require a consideration of two questions: First, were the jury properly instructed as to the character and degree of insanity necessary to suspend the operation of the statute? and, second, did the instructions correctly state the period of time during which the insanity of Irwin must have continued in order to prevent the running of the statute?

By instruction No. 8 the court attempted to define the insanity which, if found by the jury to have existed in Irwin, would defeat the prescriptive title of plaintiff in error. By it the jury were instructed that insanity "is a diseased condition of the mind, in which the person afflicted has not the right use of his reason, especially with reference to certain subjects and duties." For the purpose of determining the correctness of this definition as applicable to the facts and issues in the case at bar it will be necessary to make a brief examination of the law of insanity as applied by the courts of this country. An examination of the reported cases shows that the issue of insanity most frequently occurs in judicial proceedings as follows: First, in direct proceedings to procure the commitment of persons alleged to be insane; second, in suits affecting the validity of wills, where it is sought to show that the testator was not of disposing capacity; third, in criminal proceedings, where the defense pleaded is insanity and irresponsibility; fourth, in suits to avoid contracts because of insanity; and fifth, in proceedings otherwise barred, where the plea is that he against whom the statute of limitations is pleaded comes within the enumerated exceptions because of insanity. The rule deducible from these cases is that for the purposes of judicial inquiry men are either sane or insane, and that such insanity is either total or partial. A total deprivation of sense, without lucid intervals, presents few legal difficulties. Such an unfortunate may be presumed

39

never to be on an equality with the sane. The law, however, distinctly recognizes that species of insanity where the subject is deprived of his reason but a portion of the time; or deprived of his reason, either temporarily or permanently, only upon certain subjects. Instances of this character are not rare. They constitute the major portion, if not all, of the reported cases. Early in the history of English jurisprudence the courts did not make a distinction between different degrees of insanity. Insanity was regarded as a fixed term in law, having a certain meaning. If a man were insane on one subject, he was supposed to be insane on all subjects and for all purposes. In *Ex parte Barnsley*, 3 Atk. [Eng.], 172, Chancellor Hardwicke says: "Being '*non compos*,' 'of unsound mind,' are certain terms in law, and import a total deprivation of sense. Weakness does not carry this idea along with it, but courts of law understand what is meant by '*non compos*,' or 'insane,' as they are words of a determinate signification." Perhaps one of the leading cases announcing this doctrine is the case of *Waring v. Waring* (1848), 6 Moore P. C. [Eng.], 341. In that case it is said: "If the mind is unsound on one subject, provided that unsoundness is, at all times, existing upon that subject, it is erroneous to suppose such a mind is really sound on other subjects; it is only sound in appearance, for if the subject of the delusion be presented to it, the unsoundness would be manifested by such a person believing in the suggestions of fancy, as if they were realities; any act, therefore, done by such person, however apparently rational that act may appear to be, is void, as it is the act of a morbid or unsound mind." One of the leading cases announcing the modern doctrine is that of *Smee v. Smee*, 5 Prob. Div. [Eng.], 84, where it is said: "A man may be capable of transacting business of a complicated and important kind, involving the exercise of considerable powers of intellect, and yet may be subject to delusions so as to be unfit to make a will. But if the delusions under which a man labors are such that they could not reasonably be sup-

posed to have affected the dispositions made by his will, the will would be valid." The doctrine of the case last cited may be said to be the now-accepted doctrine of most jurisdictions in this country. In suits to avoid contracts and conveyances on the ground of insanity, it is the settled law that the insanity must have entered into and induced the conveyance or contract; in other words, that it was not the act of the free and untrammeled mind, and that on account of the diseased condition of the mind, the person entered into a contract or made a conveyance, which he would not have made had he been in possession of his reason. *Dewey v. Allgire*, 37 Nebr., 6, 8; *Staples v. Wellington*, 58 Me., 453; *Concord v. Rumney*, 45 N. H., 423, 427; *Dean v. American Mutual Life Ins. Co.*, 4 Allen [Mass.], 96; *Dennett v. Dennett*, 44 N. H., 531, 537; *Hovey v. Hobson*, 55 Me., 256, 280; *Hovey v. Chase*, 52 Me., 304; *Crowther v. Rowlandson*, 27 Cal., 376; *Titcomb v. Vantyle*, 84 Ill., 371. In the case of wills, in most all jurisdictions, it is held that the insanity available for the purpose of invalidating the will must be of a kind and degree that clearly affected the testator's disposition of his property, so that the disposition attempted to be made can not be said to have been that of the testator, but the result of mental disease. This doctrine is fully sustained by the following authorities: *Gardner v. Lambock*, 47 Ga., 133; *Trish v. Newell*, 62 Ill., 196; *Yoe v. McCord*, 74 Ill., 33; *Harvey v. Sullens' Heirs*, 56 Mo., 372; *In re Cole's Will*, 49 Wis., 179; *Benoist v. Murrin*, 58 Mo., 307; *American Seaman's Friend Society v. Hopper*, 43 Barb. [N. Y.], 625; *Garrison v. Blanton*, 48 Tex., 299; *Kempsey v. McGinniss*, 21 Mich., 123. In criminal proceedings, where the defense is insanity, the universally recognized rule is that, before the defendant can escape punishment, it must appear that the insanity induced the commission of the crime, and that the defendant, because of the diseased condition of his mind, could not understand the consequences or moral enormity of the act, or had not the power of resisting the impulse to commit the crime. *Commonwealth v. Rogers*, 7 Met. [Mass.], 500; *State v. Geddis*, 42

Ia., 264; *State v. Huting*, 21 Mo., 464; *Bovard v. State*, 30 Miss., 600; *Dejarnette v. Commonwealth*, 75 Va., 867; *Waters v. Connecticut Mutual Life Ins. Co.*, 2 Fed. Rep., 892. From an examination of the authorities cited it appears that in cases involving the issue of insanity the courts hold that a person may be of unsound mind or insane upon one or more subjects and at the same time sane upon others, and that a person may be sane upon one or more subjects at times and insane upon the same subjects at other times. In the case of *Riggs v. American Tract Society*, 95 N. Y., 503, the rule is announced that "one who is controlled by an insane delusion upon a certain subject, is as to that subject a person of unsound mind, although his reason as to other subjects may be unimpaired. This doctrine has been expressly recognized by this court in the case of *Thurman v. State*, 32 Nebr., 224, 227, where it is said: "That the law recognizes partial as well as general insanity; that a person may be insane upon one or more subjects, and sane as to others; that he may be laboring under a mental delusion upon some particular matter or regarding a particular person, and generally sane upon all other subjects."

There seems to be no valid reason why the rule regarding monomania or partial insanity should not be applied in the determination of questions involving the statute of limitations. The purpose of the law is to relieve only against that which is the direct offspring or result of insanity. The statute of limitations is said to be one of repose. It is enacted, not for the benefit of the insane, but for the benefit of the general public. It is intended to subserve the laudable purpose of staying the enforcement of stale claims, quieting the title of those long in possession of real estate, and promoting generally a prompt resort to the courts for the settlement of disputed rights. It is founded in wise and salutary public policy and should receive a liberal construction. Buswell, Limitations, sec. 6. This being the spirit and reason of the law, it is equally necessary that the statute be suspended in its operation against one under a

disability which effectually disqualifies him from taking the precautions necessary to escape its penalties. *Dodge v. Cole*, 97 Ill., 338; *Crowther v. Rowlandson*, 27 Cal.,376. In harmony with the cases cited the rule would seem to be that in actions of ejectment brought by the heirs of one alleged to be insane against a defendant who pleads adverse possession, it devolves upon the heirs to show that the insanity of their ancestor prevented him from understanding his rights, and that, owing to the diseased condition of his mind, he permitted others to assert ownership and acquire prescriptive title to his real estate; and that during the running of the statute he had no lucid interval of sufficient duration to enable him understandingly to investigate his business affairs, and acquire knowledge of the fact of such adverse possession, and that it would ripen into a title in the occupant. In the case of *Warlick v. Plonk*, 103 N. Car., 81, the supreme court of North Carolina held an instruction without error, which charged the jury in a case similar to the one at bar, "that if the alleged insane person was so mentally diseased that he was unable to understand and assert his rights, that he did not possess sufficient mental capacity to know that he was the owner of the land, and that the defendant was in possession thereof asserting title thereto, and that such possession would destroy his rights, then he labored under such disability as would prevent the operation of the statute." In our view of the case at bar, the material inquiry is, was the mind of John Irwin, between January 1, 1880, and June 18, 1884, in such a diseased condition that he did not understand that he owned the land in question, and that plaintiff in error was in adverse possession, and that such possession would deprive him of his legal title to the premises unless he took steps to prevent such result. This is the question that plaintiff in error was entitled to have answered by the verdict of the jury, and the instructions should have so framed the issue that the verdict of the jury would have been an answer.

The instruction does not correctly define insanity as ap-

plied to the case at bar, in that it does not limit the inquiry whether Irwin's insanity, if shown to exist, affected the matter in controversy, that is, whether he was unable, by reason of his diseased mind, to protect and save his property. There is some testimony in the record tending to show that Irwin had an insane delusion as to damages sustained by reason of the impressment of one of his horses at the time of an Indian outbreak. There is some evidence of other delusions. Under the instructions given, the jury might have found that upon one of these subjects he was hopelessly insane, and did not have control of his reasoning faculties; and, if such fact was found, then under the instructions they could very properly have found for defendants in error, notwithstanding the evidence might clearly have disclosed that he knew he owned the land in controversy, that plaintiff in error was in possession, and that in the course of time he would acquire title by adverse possession, unless proceedings were instituted to eject him. There are many reasons besides insanity why Irwin might have chosen not to proceed for the recovery of the land,—his opinion that it was valueless, or that the cost of proceeding would not be compensated by the recovery of the property. It does not follow as a legal conclusion that because Irwin was insane upon certain subjects and duties he was also insane with reference to his property rights involved in this action; and whether or not he was is a question for the determination of the jury, and, under the instructions given, they can not be said to have determined it. In *Young v. Stevens,* 48 N. H., 133, 136, it is said: "The question, then, in cases where incapacity to contract from defect of mind is alleged, is not whether a person's mind is impaired, nor whether he is afflicted by any particular form of insanity, but whether the powers of his mind have been so far affected by his disease as to render him incapable of transacting business like that in question." It is true that in a subsequent instruction the court told the jury they might consider "whether or not he allowed valuable property to be taken away from him with-

out taking precautions to protect the same"; but such peculiarity, together with several others quite different in character, was, with all the other facts and circumstances shown on the trial, to be considered by them for the purpose of deciding "the question whether or not John Irwin was insane under the issues and instructions in this case." But it is not possible to tell whether the issue of insanity, as framed by the court, was decided by the jury in favor of defendants in error because they found that Irwin allowed valuable property to be taken away from him, etc., as the result of insanity, or because of other and essentially different delusions, which, under the law, may have co-existed with sufficient mind to accumulate property and assert title thereto as against anyone who might claim it adversely.    Thus the material question for determination was subordinated, and placed among the other delusions, in themselves not sufficient to suspend the statute, but nevertheless competent for the jury to consider for the purpose of aiding them in forming an intelligent judgment upon the principal question.

It is not necessary to examine the other instructions given, further than to say that instruction No. 9 is open to the objection that it gives undue prominence to portions of the evidence.    The evidence of monomania upon other subjects than that directly affecting the controversy is doubtless competent within limits.    The rule is announced in *Rouch v. Zehring,* 59 Pa. St., 74, as follows: "On the question of capacity a wide scope is allowable, that the jury may possess the materials to form an intelligent judgment." In *Bower v. Bower,* 142 Ind., 194, the court said: "Evidence that a testator, for several years before his death, did not make out his own tax lists, but that they were made out and sworn to by his son, is admissible on the question of the testator's testamentary capacity."    But an instruction should not call the attention of the jury to any portion of the evidence, unless it undertakes to set out and give equal prominence to all the evidence in the case.

The instructions, taken together, do not present to the jury for their determination the material issues in the case.

Plaintiff in error assigns as error the refusal of certain instructions requested by him. It is sufficient to say that they are for the most part based upon the theory that, to defeat the statute, Irwin's insanity must have been such as amounted to a total want of understanding, or a total deprivation of sense and reason, or, at least, that he did not possess sufficient mental capacity to understand and transact the ordinary business affairs of life. These instructions, as we have seen, do not correctly state the law. We can conceive of a man able to understand and transact the ordinary business affairs of life, and yet be so insane upon the question of the power of the government to tax property, and upon the power of others to acquire title to his property by adverse possession, as to be entitled to the benefits of the statute. The offer of these instructions seems to have been based upon a doctrine claimed by counsel to have been discovered in *Witte v. Gilbert,* 10 Nebr., 539. The case does not announce the doctrine contended for. The only law in the case is that announced in the second syllabus, which is as follows: "The words 'unsound mind' are used in the statute in the same sense as the word 'insane.'" In the body of the opinion the learned chief justice made use of the following language: "The words are used in the statute in the same sense as 'insane.' Being *'non compos'*—'of unsound mind,' are certain terms in the law, and import a total deprivation of sense,"—citing *Ex parte Barnsley,* 3 Atk. [Eng.], 172, and *Mulloy v. Ingalls,* 4 Nebr., 115. It will be noticed that the purpose of the chief justice in using the language quoted was to make clear the distinction that is everywhere recognized by the courts between insanity and mere imbecility or weakness of mind, however great. In *Ex parte Barnsley* Lord Hardwicke said that a return that he is *lunaticus,* or *non compos,* means the same as unsound mind. And the purpose is made more apparent by a reference to *Mulloy v. Ingalls, supra.* This court, in the case of *Dewey v. Allgire,* 37 Nebr., 6, speaking through IRVINE, C., in considering this question, and discussing the meaning of *Mulloy v. Ingalls,* said: "We think,

however, that counsel for appellants have somewhat mis-·
taken the true import of the language used in these cases.
It is very clear that the courts have never meant by such
language that a deed will not be set aside unless the
grantor, at the time of its execution, showed an absolute
want of reason and understanding in every particular. It
has been repeatedly held that the deed of one afflicted with
monomania may be set aside where the execution of the
deed was induced by the disease. The rule, in fact, means
this: That one in the possession of his normal faculties,
and not afflicted with idiocy or actual insanity, may not, in
the absence of fraud, avoid his deed, even though he be of
inferior intellectual capacity; that the law will not under-
take to discriminate between strong and weak minds, ex-
cept to consider weakness of mind in connection with evi-
dence of fraud; that the line is drawn at actual insanity
inducing to the conveyance—insanity as distinguished
from mere weakness of mind unaccompanied by mental
disease overthrowing the reason." It follows, therefore,
that these instructions should not have been given.

Again, it is contended by plaintiff in error that the court
erred in refusing the following requested instructions:
"You are instructed that in order to defeat the title of the
defendant the plaintiffs must prove by a preponderance of
the evidence that John Irwin was insane within the mean-
ing of the law as defined by the court continuously from the
1st day of January, 1880, to June 18, 1884, without any
lucid interval of sufficient duration for him to understand-
ingly investigate his business affairs." Plaintiff in error
was entitled to have the issue confined between the dates
mentioned. Any evidence of insanity of Irwin before or
after the period mentioned would be wholly immaterial,
except in so far as it would be valuable and was properly
admitted in aiding the jury to determine whether or not he
was insane between the dates mentioned. If the court, in
the instructions given on its own motion, had correctly
defined insanity as applicable to the facts in the case at
bar, this instruction would have been apt, and would have

materially assisted the jury in arriving at a correct verdict. It should have been given.

Having reached a conclusion which requires that the judgment of the trial court be reversed, it is not necessary to determine whether the evidence supports the verdict. It follows from what has been said that the judgment should be reversed, and a new trial granted.

HASTINGS and DAY, CC., concur.

By the Court: For the reasons stated in the foregoing opinion, the judgment of the district court is

REVERSED.

NOTE.—As to competency of opinion of non-expert expressed outside of court room, when such expression was a part of the transaction upon which the witness's opinion was based, see Guiteau's Trial, Part I., pp. 444-447.—REPORTER.